IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ARTHUR MORRIS, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:11-CV-0527-K |
| | § | |
| DALLAS COUNTY, ET AL., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are Defendants' Frye, Joseph and Warden's Motion for Summary Judgment, filed December 13, 2012, and Defendant Dallas County's Motion for Summary Judgment, filed December 21, 2012.  The court has reviewed and considered the motions, combined response, replies, the summary judgment evidence, and the applicable law.  For the reasons that follow, Defendant Joseph's motion for summary judgment is **granted,** and Defendants Frye, Warden and Dallas County's motions for summary judgment are **granted in part**, and **denied in part**.

### I.    Factual and Procedural Background

The majority of the facts presented herein are undisputed.  Any material factual disputes are noted by the court, and will be viewed in the light most favorable to Plaintiffs.

1

### A.    Morris's Arrival at the Jail and Time in Central Intake

Plaintiffs' son Craig Morris ("Morris") was arrested on the evening of August 1, 2009 and brought to Central Intake at the Dallas County Jail.  He was given a health screening by a nurse in Central Intake at approximately 7:30 p.m.  During this screening, Morris reported that he had been experiencing nausea and vomiting, with an elevated temperature, and also stated that he had broken ribs but he said he had not had an x-ray.  At the time of this health screening, Morris's vital signs were stable.  Nothing in the records related to the health screening Morris had at Central Intake shows any documented complaint of chest pain or other pain.  The nurse there noted on the screening record that Morris was drinking alcohol daily, and the only entry on the "problem list" was that he needed to detox.

Because he appeared to be suffering from alcohol withdrawal, the Central Intake nurse referred Morris to the jail's Medical Assessment Program ("MAP") and to the infirmary following the MAP provider evaluation.  She also requested that Morris be given "Expedite" status for medical reasons, and explained that the specific concern was alcohol detoxification.  An inmate with an "Expedite" is supposed to go straight to MAP, but even inmates on "Expedite" status still must go through the booking process before coming to MAP.  None of the parties have produced any evidence regarding how quickly a  medical "Expedite" request due to apparent alcohol withdrawal is required to be completed.  Morris was then booked into the jail at 8:37 p.m.

2

### B.     Morris's Initial Appearance

Jail records show that Morris's appearance before the Magistrate was expedited at 11:05 p.m.  He appeared before the Magistrate at 11:20, and was finished at the Magistrate by 12:02 a.m. on August 2, 2009.

### C.     Morris is Taken to the Medical Assessment Program ("MAP")

After he was finished at the Magistrate, Morris  went to MAP, where he was seen by Defendant Wendy Joseph, P.A. ("Joseph") at 1:20 a.m.  Joseph examined Morris and found that his lungs were clear, without wheezes or abnormal crackling or rattling sounds (also known as "rales"), and noted that Morris had nausea, vomiting, and delirium tremors ("DT's").   During the exam, Morris removed his shirt and Joseph palpated (or examined by touch) his chest and abdomen.  She found no bruising or injury in those areas.  Morris also did not complain upon palpation of those areas, and Joseph did not order an x-ray.  She also evaluated Morris's vital signs and found them stable, although his blood pressure was slightly elevated.  She concluded that the high blood pressure was consistent with alcohol withdrawal.  Morris told Joseph he had "the shakes" in his hands and legs, but he did not tell her he had been in an altercation or that he thought he might have broken ribs.  He was verbal and not hallucinating.

The MAP assessment form completed by Joseph states that Morris disclosed a history of daily alcohol abuse, but does not mention broken ribs.  The record does not show that Joseph had the Central Intake form referencing  broken ribs. Sometimes these

forms came to MAP with the patient, and sometimes they did not.  Joseph does not recall whether she had the form during her encounter with Morris; however, the MAP assessment form she prepared indicates that she did not.  Morris also was assessed for tuberculosis while in MAP, and told the nurse "no" when asked if he had experienced a cough longer than 3 weeks, coughing up blood, night sweats, or unexplained weight loss.

Like the Central Intake nurse, Joseph determined that Morris was experiencing alcohol withdrawal, and needed to detox.  Joseph prescribed several drugs to Morris that were administered by a nurse before he left MAP, and placed Morris on the jail's detox protocol.  This protocol called for various medications to be given and vital signs taken at least every 12 hours for several days.  Overall, based upon her own examination and what Morris told her, Joseph found him to be a medically stable alcoholic inmate with an acuity level of 2 or "non-urgent," and recommended that he be assigned to the infirmary.  In Joseph's judgment, nothing about Morris's condition indicated that he should be taken to the emergency room.

The Medical Assessment Program provider and nurse on duty are not permitted to leave the MAP area. Once an inmate is transferred from MAP into the infirmary, all follow up care is done by jail health staff, unless someone from the infirmary asks a MAP provider to see an inmate on an emergency basis.  After Morris left the MAP area, Joseph was not asked to see, nor did she, see Morris again (Joseph's shift ended at 7:00 a.m.).

After Joseph finished her assessment and orders for Morris, sheriff's department personnel took him to a waiting area pending his reassignment to the infirmary.

### D.   Morris is Assigned and Transferred to the Infirmary

The parties agree that Morris was sent to the infirmary of the Dallas County Jail in the early hours of August 2, 2009, and spent the remaining hours of his life there.

### 1.   Description of the Infirmary

The infirmary has 14 tanks, and each tank houses 8-16 inmates.  There are no guards in the tanks, but the tanks are watched from a guard station using  video surveillance.  On each shift, four field officers made regular rounds of the tanks to check for fire hazards.  They also would distribute and pick up meal trays, and give inmates the supplies needed to keep their tanks clean (e.g. mops and buckets). If inmates needed the guards' attention, they communicated using an intercom system between the tank and the guard station.

When an inmate's vital signs were being checked, neither the guard nor the nurse would go into the tanks.  The guard would call an inmate's name, and he would come out individually to have his vitals taken outside the tank.  The nurses and officers also did not go inside the tanks during medication pass.  The officers went into the tanks only to check for hygiene and cleanliness.  Defendant Dallas County stipulated that the jail security officers did  not monitor the medical condition of the inmates, and that there were no policies for such monitoring.  Frye also testified that there was no formal

procedure for guards to pass medical information or observations regarding inmates to the nursing staff, and that there was no training for doing so, although she believed that the guards should relay that kind of information since the nursing staff did not go into the tanks.

Inmates in the tanks were unable to directly contact any of the jail's nursing or other medical personnel.  Some of the tanks were visible from where the  medical personnel were, and some were not.  Morris was in a tank that was down the hall, where inmates could not wave through the window to get the attention of the medical staff. If an inmate had an emergent medical issue, they had to contact the guards at the guard station via intercom.  The officers in the guard station then were responsible for relaying the information to the medical staff.  There was no way for inmates to contact the medical staff directly.

### 2.    Morris's Stay in the Infirmary

Morris arrived to the infirmary floor at 2:41 a.m., and was examined in the infirmary at 3:34 a.m.  There, nurse Debra Smith ("Smith") reviewed the MAP transfer documents and noted Morris's history of alcohol abuse. She found Morris to be alert and oriented.  Morris told her of his 30 year history of alcohol abuse, that he had delirium tremors in the past, and that he had been assaulted two weeks prior and broken his ribs, but had not sought medical attention for this injury.  Upon examination, Smith found no bruising to Morris's rib area, that his lungs were clear, and that he was not

experiencing respiratory distress.  Smith's notes show that both Morris's vital signs and overall condition were stable.  Smith's follow-up plan for Morris was to continue with the medications ordered by Joseph and the monitoring of his vital signs.  Smith also ordered that Morris be placed for a follow-up provider visit and a rib x-ray.  She then had Morris returned to his tank.

At 6:00 a.m. on August 2, L.V.N. Teresa Frye ("Frye") began her shift, and took report from Smith.  Frye was responsible for five tanks in the infirmary, with a total of approximately 100-110 inmates.  Smith and Frye talked for a little over 20 minutes, and Frye was told that she had a "new detoxer" in Tank 1.  Frye understood that someone going through detox would need nursing care, but when she checked the computer no order for the detox protocol had been scanned in for Morris.  Therefore, she could not give him the medications provided for by the protocol.  During their meeting, Smith did not tell Frye that Morris had broken ribs, needed an x-ray, or was having difficulty breathing.  Two of Frye's primary responsibilities in the tanks were medication pass and wound care.

One of the other inmates in Morris's tank was Peter Iagmin ("Iagmin").  When Morris was brought to the tank, Iagmin noticed that he seemed to be in pain, and was wheezing, hacking, and had difficulty breathing.  Iagmin apparently checked Morris's abdomen, but did not see bruising on his ribs.  Morris was confused, said only a few words at that time, and those words were unclear.  Iagmin also assumed that Morris was

7

detoxing.  Morris kept trying to drink water, but had a hard time holding the cup due to his shaking.  Iagmin saw Morris vomit the water back up.  He also had three instances of diarrhea.

Sometime the morning of August 2, Detention Service Officer Holley ("Holley"), took Morris down the hall to where vital signs were being taken, and noticed that he was shaking and taking smaller than normal steps.  He also remembers an unnamed inmate telling him that Morris could not walk normally because he had broken ribs.  Holley mentioned this to the nurse, who also is not identified.  Holley says that the unnamed nurse on duty told him that broken ribs "might be a good reason for [Morris] to walk." Because of Morris's shaking, the nurse had to ask him to relax in order to get his vital signs.  She did not tell Holley whether she had successfully obtained Morris's vitals, what the readings were, or whether there was a problem with his vital signs.  Although L.V.N. Frye was not present, she believes it was Certified Medical Assistant Velva Haynes ("Haynes") who took this set of vital signs.  Haynes and Holley did not tell Frye that Morris had broken ribs or was unable to walk.  After his vital signs were completed, Holley escorted Morris back to the tank and placed him in his bunk.

Because Morris had soiled himself, Iagmin requested a change of clothing for him at around 8:00 a.m.  No one brought clean clothes for Morris.  After vitals were checked, Iagmin asked again, and one was provided.  Iagmin and the other inmates in the tank helped him get changed.  At around 10:20 that morning, the guards began passing the

lunch trays.  Iagmin and some other inmates brought Morris his lunch tray.  Morris had difficulty eating because of his shaking, and Iagmin saw that Jell-O was spilling down the side of Morris's face.  The inmates were given 15-20 minutes to eat before Detention Service Officer Williams ("Williams") returned to pick up the trays.  Williams made no comment to anyone about Morris's inability to eat, and did not ask anyone else in the tank about Morris's condition.  Iagmin stated that when Williams was in the tank, Morris was making loud grunting and wheezing noises, and seemed to be breathing with difficulty.

Morris's next set of vital signs were entered into the system at 10:36 a.m. on August 2, although it was unclear what time those vital signs were actually taken.  Those readings showed an abnormally low blood pressure and high pulse rate.  Haynes entered those vitals into Morris's medical record, and also noted that she "gave info to nurse," but her notation failed to identify which nurse.  Andrea Warden ("Warden"), is a registered nurse who is also a Defendant in this case.  Warden testified that if Haynes had given the information to the nurse assigned to Morris's tank, it would have been Frye, but that Haynes could have given it to "whoever (sic) [was] available."  Frye denies that she was ever given any information regarding Morris' abnormal vital signs.  None of the parties cite to or have included any testimony from Haynes in the summary judgment record.

Because this set of vital signs was unstable, they should have been immediately reported to a nurse, who would manually re-take them to see if they were accurate, and who would also assess the patient for correlation of the re-checked vital signs to the inmate's clinical presentation at that time.  Both sides agree that Morris's vital signs were not immediately re-checked after either this unstable reading (whenever it was taken) or when Haynes "gave [the] info to nurse."

Morris remained in the tank, and Iagmin saw that he was coughing up yellow-green phlegm that was smeared on his face and shirt.  Iagmin says Morris also lost control of his bowels again, and crawled into the shower while still clothed.  Iagmin called the guard station and asked them to come get Morris because he was slumped over on the floor in the shower, but no one came.  Iagmin called the guards again and said "you have to come get him, he's lost it and needs a nurse."  This time, Officers Jeffrey, Williams and Holley came to the tank.  Holley found Morris to be incoherent and unresponsive, and Williams described him as shaking and unable to walk on his own.  Williams concluded that Morris was detoxing, but wondered why he was in the infirmary instead of Parkland hospital.  To Officer Williams, Morris seemed "really out of it," and Holley described him as "drunk" and incoherent.  The guards put Morris on his bunk and notified medical personnel, however they had not been trained to ask the other inmates for information about Morris's condition, and they did not ask for any

such information.  Iagmin told the guards that Morris needed medical attention and should not be brought back to the tank because the inmates could not handle him.

Nurse Warden came to the tank to see Morris.  Iagmin remembers that Morris was shaking as if detoxing from alcohol, and was breathing with difficulty.  Warden did not ask the other inmates or the guards any questions about Morris's medical condition or what had been going on with him, although someone told her he was detoxing and was not feeling well.  Warden tried unsuccessfully to get Morris's vital signs, and asked the officers to bring him to the nurses' station for an assessment.  Because he told Warden he felt weak, Morris was placed in a wheelchair and taken from the tank to the nurses' station at about 1:05 p.m.

Holley states that when Morris was brought to the nurses' station, his jumper was soaking wet from top to bottom.  Warden took his vital signs manually.  Morris's blood pressure was 90/60, with a pulse of 101 beats per minute.  Although these readings and Morris's other vital signs were stable, his blood pressure was close to, but not quite low enough for Warden to be required to "notify provider."  If the MAP provider had been notified, they could have come to examine the inmate themselves or given a verbal order over the phone to send the inmate to Parkland Hospital.

During her encounter with him, Warden did not look at Morris's electronic medical record or any of his prior vital sign readings.  Warden assessed Morris to be alert, awake and oriented to person, place, and time.  Although he had tremors in both

11

hands, she attributed them to alcohol withdrawal.  Warden found Morris to be talkative, and testified that he was joking with the nurses.  Warden says she did not observe any respiratory issues, coughing or wheezing, and he did not have a fever.  Warden found out that the alcohol detox protocol had been ordered for Morris, which included a prn (or "as needed") order to give him Ativan every two hours for symptoms including tremors. Because Morris was feeling ill and continuing to have tremors, Warden decided that an intramuscular injection of Ativan would help ease his symptoms and allow him to rest.

While Morris was at the nurses' station, Frye returned from a break and told Warden that Morris was in the infirmary for alcohol detox.  Warden told Frye what Morris's current vital signs were, and that she thought he should have the intramuscular dose of Ativan.  Frye agreed. Frye says she did not notice that Morris was having trouble breathing, and Morris did not tell her he had broken ribs.  Frye did not get any information from the guards about Morris's condition.  When Frye talked to Morris, he told her he was feeling a little shaky and had been incontinent, and he presented to her as jovial and pleasant.  Either Frye or Warden gave Morris his Ativan, and kept him at the nurses' station while he ate peanut butter and crackers, juice, and ice.  Frye and Warden both claim that while he was at the nurses' station, Morris was not coughing or wheezing, and did not have any other symptoms that indicated he might have trouble breathing.  Frye assumed that after being returned to his tank, officers would observe Morris every 30 minutes.

12

Morris was returned to the tank by Holley and Williams about 30 minutes after he had left.  He was still in his wet jumper, and according to Iagmin, was still having the same problems with his breathing.  Iagmin was surprised that he returned so quickly, but noticed that the Ativan was taking effect, and that Morris seemed to be calming down and becoming sedated.  Holley and Williams placed him in his bunk and left.  At some point thereafter, Morris ended up on the floor again after going into the bathroom.  Morris could not get back into his bunk, and the inmates were unable to get him into his bunk either.  Morris remained on the floor and seemed to be having great difficulty breathing.  The inmates called out to the guard station, but got no answer.  It seemed that it hurt Morris to breathe, and that every breath he took was painful.

Over the next 20 minutes, Iagmin and another inmate called the guard station by intercom several more times, but still got no answer.  At that point, Iagmin concluded that the guards were tired of the situation and were "done" dealing with Morris.   Morris was still on the floor. Iagmin covered Morris with a blanket, and laid down on his bunk.  Morris's breathing slowed and got quieter, and Iagmin thought Morris had gone to sleep.  Iagmin also fell asleep.

Sometime between when they returned Morris from the nurses' station and 2:15 p.m., officers Holley and Williams saw Morris lying on the floor.  No training or policy required them to check on his well being, notify medical personnel, or do anything else when they observed an inmate on the floor.  They decided not to wake him because they

13

thought lying on the floor must have felt good to him.  At the 2:15 p.m. shift change, Holley told the incoming officers that Morris had been taken to the nurses' station during the prior shift, and that the arriving officers needed to keep an eye on him.  There was no policy or requirement that anyone follow up or check on Morris's condition at any particular interval of time after he left the nurses' station, unless the nurses had ordered a periodic observation.  The nurses did not issue an order instructing the guards to check on Morris's condition.

Iagmin woke up because another inmate was banging on the door calling for help. Morris had turned blue, and blood was trickling out of the corner of his mouth.  At around 2:40 p.m., officers and nursing staff received a "man down" call for Tank 1. Nurses Frye and Warden responded, and found that Morris had no pulse.  Warden began CPR while Frye went to get an automated external defibrillator ("AED").  She sent the AED to the tank with another LVN, and called MAP to send the physician's assistant immediately.  When Frye returned to Tank 1, Morris had been connected to the AED and a shock was  administered.  The MAP provider arrived, and 911 was also called.  The nurses continued CPR but were unable to revive Morris.  EMS arrived, but after assessing Morris, declared him dead at 3:01 p.m.

At 4:39 p.m., Frye noted in Morris's medical chart that she had assessed him at 1:20 p.m. Morris's medical chart was scanned into the system on August 11, 2009.  An

14

autopsy performed the day after Morris died showed the cause of death to be Klebsiella pneumonia due to chronic ethanolism.

###### E.     Conduct of Dallas County and its Policymaker

Cathy McCaffrey ("McCaffrey") is the Training Coordinator for the Dallas County Sheriff's Academy.   The training given to the Detention Service Officers ("DSOs") does not include any training regarding the intake process, or how to evaluate information regarding an inmate when they first come into the intake area. The County has no transport policies that apply to transporting inmates to MAP after central intake screening.  The County also does not train DSOs regarding what it means for an inmate to be "Expedited" or how quickly an inmate needs to be taken to MAP.

All employees of the Dallas County Sheriff's Department (the "County") who are hired as DSOs are required to undergo training in accordance with the standards of the Texas Commission on Law Enforcement Officer Standards ("TCLEOSE").   The TCLEOSE standards set minimum standards for each county, and the training provided can be expanded upon by any particular county.  To work in the jail, officers must complete the training, and also pass the examinations given by TCLEOSE after that training and be licensed by TCLEOSE.  The TCLEOSE training standards are the minimum standards for such training.  Unit 17 of the TCLEOSE training is devoted to various aspects of inmate health records and services. Each of the "Learning

Objectives" in Unit 17 is intended to train DSOs on these aspects of inmate health and medical needs.

DSOs working in the infirmary do not receive any different or specialized training beyond the training provided to DSOs assigned to work with the general jail population. The County does not train DSOs to look for or be aware of the signs or symptoms of physical illness in an inmate. TCLEOSE Learning Objective 17.2.7 requires that officers be trained to observe inmates' interactions with peers, and to note continuing complaints from other inmates regarding medical issues. Dallas County does not train DSOs to observe for information regarding an inmate's wellness from their observations of the cell, or from an inmate's interactions with other inmates, or to consider information they get about an inmate's health from other inmates. Learning Objective 17.2.2 of the TCLEOSE minimum training requires officers to learn how to recognize medical needs and respond to them by seeing that inmates receive proper professional care, but the County provides no training for DSOs regarding how to respond to or document requests for medical care by inmates, how to pass information regarding a medical concern on to jail health care providers, or the importance of doing so.

Under TCLEOSE Learning Objectives 17.2.8 and 17.2.9, officers must learn to "identify some methods of performing medical and mental examinations on an inmate," and be able to list some of the requirements. Dallas County has chosen not to provide its DSOs with this training. Similarly, Learning Objectives 17.2.3, 17.2.4 and 17.2.5

all relate to medication – specifically, consulting with medical personnel regarding medication, methods for identifying an inmate to receive medication, and methods for administration of medication, but Dallas County does not train its DSOs on these topics. The DSO training includes a CPR course, but they are not otherwise trained to identify or respond to the inmates' medical needs.

Training Coordinator Cathy McCaffrey, who is in charge of the County's DSO training, does not know if the County trains DSOs on how to report what they observe concerning inmate health issues. She does not know if or how the officers working in the guard station are trained to convey the information to health staff. Dallas County admits that jail DSOs are not trained on recognition of debilitating health conditions or being able to identify medical needs. Although one the purposes of the DSO training is to keep inmates safe, McCaffrey stated the County does not include medical needs within their training on inmate safety because the medical needs "are performed by the nursing staff." There is no emphasis in their training on how to identify medical needs, or what to do or how to respond when inmates request medical help, or if they get complaints or information about an inmate's medical condition from other inmates.

Sheriff Lupe Valdez ("Valdez") is the top of the chain of command for the Dallas County Sheriff's Department, and is its final policymaker. Valdez is ultimately responsible for ensuring that officers working in the jail receive proper training, including TCLEOSE training. Despite the content of the TCLEOSE training that is focused on

17

inmates' medical needs, Valdez says that she does not want her guards assessing prisoners' medical needs, because it would be "too much." When asked about County training and policies regarding officers being able to recognize medical needs, she admits that the County has "almost none, if there is any."  Valdez is "against" training officers on how to observe an inmate's interactions with cell mates to make any kind of assessment about them.  Valdez does not want this type of training or responsibility for her officers because "for an assessment to happen by the officer, I'd have to have 100 more officers to do that.  And the taxpayers would kill me."

In Valdez's view, corrections officers should not make any medical or physical observation or assessment of inmates.  She does not want her officers trained on medical signs and symptoms, or what to do if a prisoner is medically expedited.  Sheriff Valdez, on behalf of the County, has made a deliberate choice not to do this training.  Valdez states that if an inmate is so obviously unwell that even non-medical personnel would recognize their condition, they will not be allowed into the jail, and must be taken to Parkland.  Although a nurse would potentially be consulted regarding this decision, there is no training or policy for DSOs to follow in a situation where a prisoner is too ill to be arraigned.

Dallas County has stipulated that it did not monitor inmates for medical issues, and had no policies addressing that.  Dallas County also has stipulated that it had no procedures by which medical staff could inform a guard that an inmate needed to be

monitored for the inmate's protection.  After Morris died, Dallas County chose not to provide additional training, or change the training given to its DSOs.

### E.    Plaintiffs' Lawsuit

Following Morris's death, Plaintiffs brought suit against Dallas County, Frye, Joseph, and Warden in state court.  Defendants subsequently removed the case to this court.  Plaintiffs bring federal claims against the County under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and for alleged constitutional violations under 42 U.S.C. § 1983.  They also assert  state law claims for negligence and gross negligence against the County.  Plaintiffs also have alleged violations of section 1983 by the three individual Defendants Frye, Joseph and Warden.  Defendants now move for summary judgment on all of Plaintiffs' claims.

### II.    Summary Judgment Standards

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2551 (1986). The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 322-25, 106 S.Ct. at 2551-54.  Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted; the nonmovant may

not rest upon allegations in the pleadings, but must support the response to the motion with summary judgment evidence showing the existence of a genuine fact issue for trial. *Id.* at 321-25, 106 S.Ct. at 2551-54; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-57, 106 S.Ct. 2505, 2513-14 (1986).  All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993 (1962).

When a qualified immunity defense is asserted on summary judgment, the plaintiff must rebut the defense by establishing that the officer's alleged wrongful conduct violated clearly established law.  *Michalik v. Hermann,* 422 F.3d 252, 262 (5th Cir. 2005); *Bazan v. Hidalgo County,* 246 F.3d 481, 489 (5th Cir. 2001).  The plaintiff cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the officer's conduct.  *Id.*

## III.   Individual Defendants' Motions for Summary Judgment

Plaintiffs assert constitutional claims against P.A. Joseph and Nurses Frye and Warden under 42 U.S.C. § 1983.  It is undisputed that Joseph, Frye, and Warden all were acting as employees of the Dallas County Hospital District d/b/a Parkland Memorial Hospital ("Parkland") at all times relevant to Plaintiffs' claims.  Frye, Joseph and Warden have all moved for summary judgment on multiple grounds, raising the defense of qualified immunity, and further arguing that Plaintiffs cannot raise a genuine issue of material fact regarding deliberate indifference and causation.   Thus, they

contend they are entitled to judgment as a matter of law.   The court will discuss Plaintiffs' claims against each individual Defendant.

### A.   Applicable Legal Standards – Deliberate Indifference and Qualified Immunity

Both pretrial detainees and convicted inmates are entitled to and may not be denied medical care. *Hare v. City of Corinth,* 74 F.3d 633, 650 (5th Cir. 1996).  A serious medical need is one for which treatment has been recommended or the need is so apparent that even laymen would recognize that care is required. *Gobert v. Caldwell,* 463 F.3d 339, 345 (5th Cir. 2006); *Gilbert v. French,* 665 F. Supp.2d 743, 757 (S.D. Tex. 2009), *aff'd,* 400 Fed Appx. 842, 2010 WL 4350653 (5thCir. 2010). To prevail on a claim for denial of medical care, a pretrial detainee must show that the jail official had subjective knowledge of a serious risk of harm to him, but responded with deliberate indifference to that risk.   *Hare,* 74 F.3d at 650.  Deliberate indifference is shown when an official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).  A state actor's failure to alleviate a significant risk he should have perceived but did not does not rise to the level of deliberate indifference. *McClendon v. City of Columbia,* 305 F.3d 314, 326 n.8 (5th Cir. 2002), *cert. denied,* 537 U.S. 1232 (2003); *Farmer,* 511 U.S. at 838.  Deliberate indifference is a state of mind more blameworthy than negligence, but it is satisfied by something less than acts or

omissions for the very purpose of causing harm or with knowledge that harm will result. *Farmer,* 511 U.S. at 835.

To establish deliberate indifference to medical needs, a plaintiff must show that the official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evidence a wanton disregard for any serious medical needs." *Domino v. Texas Dept. of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001). An incorrect diagnosis by medical personnel or medical malpractice does not amount to deliberate indifference. *Id.* Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. *Hernandez ex rel Hernandez v. Texas Dept. Of Protective and Regulatory Svcs.,* 380 F.3d 872, 883 (5th Cir. 2004); *Alton v. Texas A&M Univ.,* 168 F.3d 196, 201 (5th Cir. 1999).

To determine whether an official is entitled to qualified immunity, the court follows a two-part inquiry. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). First, the court must determine whether the facts alleged or shown are sufficient to make out a violation of a constitutional or federal statutory right. If no such violation is made out, no further inquiry is necessary. *Id.* The second prong of the test consists of two separate inquiries: 1) whether the allegedly violated constitutional right was clearly established at the time of the incident, and if so, 2) whether the conduct was objectively reasonable in light of then clearly established law. *Tarver v. City of Edna,* 410 F.3d 745, 750 (5th Cir. 2005).

22

A right is "clearly established" when its contours are sufficiently clear that a reasonable public official would have realized or understood that his conduct violated the right at issue, and that his or her actions are unlawful in light of pre-existing law. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Stefanoff v. Hays County,* 154 F.3d 523, 525 (5th Cir. 1998).

The relevant question is whether a reasonable public official could have believed that his or her conduct was lawful in light of clearly established law and the information her or she possessed. *Anderson,* 483 U.S. at 641. If public officials of reasonable competence could disagree on the illegality of the conduct, immunity should be recognized. *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *Gibson v. Rich,* 44 F.3d 274, 277 (5th Cir. 1995). Conversely, an official is not protected by qualified immunity if, in light of clearly established pre-existing law, it was apparent that the conduct, when undertaken, would be a violation of the right at issue. *Foster v. City of Lake Jackson,* 28 F.3d 425, 429 (5th Cir. 1994). For an official to surrender qualified immunity, pre-existing law must "truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Pierce v. Smith,* 117 F.3d 866, 871-72 (5th Cir. 1997). It is the plaintiff's burden to present specific facts showing the inapplicability of an asserted qualified immunity defense. *McClendon,* 305 F.3d at 323; *Nunez v. Sims,* 341 F.3d 385, 388 (5th Cir. 2003).

23

### B.      Claims against Joseph, Frye, and Warden

Plaintiffs have asserted claims against Joseph, Frye, and Warden for seven different violations of Morris's constitutional rights.  The specific bases for these claims are: 1) ignoring an "Expedite" to medical and waiting approximately six hours to provide initial medical care; 2) failing to review any part of Morris's chart, prior assessments, or records of other vitals; 3) demonstrating deliberate indifference to the serious medical needs of Morris by placing him in a cell even though he was breathing with extreme difficulty, unable to walk, complaining of chest pain or broken ribs, and confused; 4) failing to provide him with any medical care, follow up, medications, or assessment at all between 3:30 a.m. and 1:00 p.m.; 5) failing to act upon abnormal vital signs taken at 7:15 a.m. and entered into the records at 10:30 a.m.; 6) failing to acknowledge that Morris was incontinent, unable to walk, wheezing, dehydrated and vomiting when they saw him at 1:00 p.m.; and 7) sending Morris back to his cell with no monitoring or intervention despite his critical illness.

These allegations are made broadly against each of the individual Defendants, without specifying which allegations are or are not applicable to Joseph, Frye, and/or Warden.  In ascertaining whether the record sufficiently reflects a genuine issue of material fact, the court must examine the culpability of each defendant separately. *Hernandez,* 380 F.3d at 883; *Stewart v. Murphy,* 174 F.3d 530, 537 (5th Cir.), *cert. denied,* 528 U.S. 906 (1999).  The parties do not dispute whether a pretrial detainee's right to

medical care was clearly established at the time of these events. Therefore, the court will focus on the contested parts of the analysis – deliberate indifference and whether a reasonable official could have believed the conduct of Joseph, Frye, and Warden was lawful in light of clearly established law, and the information each possessed. *Anderson,* 483 U.S. at 641.

### 1. Conduct of Wendy Joseph, P.A.

P.A. Wendy Joseph saw Morris at about 1:20 a.m., after the Central Intake nurse referred him to MAP. The court will examine Joseph's actions with regard to each of the seven alleged constitutional violations. With respect to the first alleged violation, there is no evidence to show that Joseph had any involvement in the amount of time it took for the County to bring Morris to MAP following the Central Intake nurse's "Expedite" designation. Therefore, Plaintiffs cannot raise a genuine issue of material fact regarding either deliberate indifference or causation with respect to this claim.

Plaintiffs' next claim against Joseph is for alleged failure to review prior records of vital signs, assessments and treatments. Joseph argues that this is an allegation of negligence, not deliberate indifference, and also points out that whether or not she reviewed Morris's prior medical records, she still was required to do her own examination and assessment of Morris. It is undisputed that Joseph did such an exam, including Morris's vital signs, and took a history from Morris herself. It is also undisputed that when he was with Joseph, Morris's vital signs were stable, and her examination showed

his lungs to be clear. She noted no breathing difficulty and saw nothing indicating an injury to Morris's ribs or abdomen. Although his blood pressure was a bit high, Joseph interpreted this to be due to alcohol withdrawal, which would be consistent with Morris's self-reported history of long term alcohol abuse.

It is undisputed that Joseph did not ignore or disregard Morris's symptoms of alcohol withdrawal. She ordered that he be placed on the jail's alcohol detox protocol, and that he be assigned to the infirmary, and given medication, and follow-up care. While Joseph may have acted negligently in failing to review Morris's medical records from Central Intake, given that she did her own examination and took Morris's history during her encounter with Morris, such failure to review earlier records does not amount to either a deliberate disregard of Morris's medical needs, or a constitutional violation. *See Hernandez,* 380 F.3d at 883 (negligent failure to act will not divest official of qualified immunity). Viewing the evidence in the light most favorable to them, it is clear that Plaintiffs' cannot raise a material fact issue related to this claim, as to both deliberate indifference or causation.

Plaintiffs' next allegation against the individual Defendants is that they were alleged to have been deliberately indifferent to his medical needs because they placed him in a cell even though he was breathing with extreme difficulty, unable to walk, complaining of chest pain or broken ribs, and confused. There is no evidence in the record to suggest that Joseph placed Morris in a cell. It is undisputed Joseph's only

26

interaction with Morris was in MAP, and from there she referred him to the infirmary. Plaintiffs have not raised a genuine issue of material fact regarding this claim against Joseph.  Similarly, the remaining four claims against Joseph all pertain to events that took place after Joseph saw Morris in MAP.  It is undisputed that Joseph had no involvement with Morris after he left MAP.  Accordingly, Plaintiffs cannot establish either deliberate indifference by Joseph or causation with regard to these claims.  Based upon the summary judgment record, and viewing all the facts in the light most favorable to Plaintiffs, the court finds that no reasonable fact finder could find that Joseph acted unlawfully in light of clearly established law and the information she possessed.  Thus, Joseph's motion for summary judgment is granted, and Joseph is entitled to qualified immunity.

### 2.    Conduct of Andrea Warden, R.N.

Andrea Warden, R.N. first encountered Morris at about 1:00 p.m. on August 2, 2009, the day Morris died.  As with Joseph, the court will analyze Warden's conduct against Plaintiffs' seven alleged constitutional violations.  As with Joseph, there is no evidence in the record to suggest that Warden had anything to do with an alleged delay in medical attention for Morris after Central Intake requested that he be Expedited.  It is undisputed that Warden was not at the jail at this time, and she did not begin work until  6:30 a.m.  on August 2nd.  Therefore, Plaintiffs cannot raise a material fact issue

whether Warden either caused this delay and/or is entitled to qualified immunity regarding these allegations.  This claim against Warden must be dismissed.

 As is described in more detail above, Warden's involvement with Morris began because she was asked by a DSO to check on him in his cell at about 1:00 p.m. on August 2. When she was unable to get Morris's vital signs there, she had him brought to the nurses' station.  Plaintiffs' second claim is for failure to review any part of Morris's chart, prior assessment, or record of other vitals.  Although Warden did not review Morris's chart when he came to the nurses' station at around 1:00 p.m., she  took her own vital sign readings from Morris at that time, did an assessment (the fourth medical assessment of Morris in less than a 24 hour period), and also determined that Morris was on the alcohol detox protocol.  That set of vital signs was stable, albeit barely so. Therefore, it cannot be said that Warden ignored or disregarded his medical needs by failing to review prior assessments or vitals.  While it may have been helpful to have the information found in the earlier medical records, and Warden's failure to read them was potentially negligent, there is no proof in the record to show that Warden had any awareness that some of the prior vital signs were abnormal, and acted with deliberate indifference in this instance.  Warden  is entitled to summary judgment on this claim.

Plaintiffs' third claim against Warden asserts that she was deliberately indifferent by "placing him in a cell."  Nothing in the record shows that Warden was involved in the decision to place Morris in a cell despite his medical symptoms.  Morris arrived in

the infirmary at 2:41 a.m., and was already in Tank 1 when Warden started her shift at 6:30.  Because there are simply no facts to support this claim against Warden, it must be dismissed.

The next two claims against Warden are for failing to provide medical care, follow up, medications or assessment between 3:30 a.m. and 1:00 p.m., and failing to act upon the abnormal vital signs taken at 7:15 a.m. and entered into the records at 10:30 a.m. As described more fully above, Haynes's note that she "gave info" regarding Morris's abnormal vital signs (blood pressure of 69/53 and pulse rate 163) to "nurse." No evidence identifies that nurse. Warden denies being the nurse that received the information, but admits that Haynes could have given it to any of the nurses on duty. While the testimony of Haynes could be helpful in determining to whom she gave this information, none of the parties have included it in the record.  Therefore, when viewing this fact in the light most favorable to Plaintiffs, the court must presume that Haynes could have given the vital signs to Warden.  It is undisputed that Warden did not start work until 6:30 a.m., so she could not be liable for any failure to render medical care to Morris prior to that time.  It is also undisputed that Warden was not assigned to Morris's tank, so the record shows that the earliest possible time Warden could have been made aware of Morris's medical condition was 7:15 a.m. when the abnormal vital signs were taken.   This set of vital signs included an extremely low blood pressure and abnormally high pulse rate.

Because there is a fact issue regarding who Haynes gave these vitals to, if it was Warden, the court must conclude that a reasonable officer who received these vital signs and did nothing to follow up could not have believed her conduct was lawful in light of that information and clearly established law.  Indulging all inferences in the light most favorable to Plaintiffs, the court finds there is a material issue of fact regarding this claim, and Warden's qualified immunity defense.

Plaintiffs' last two claims against Warden are that she was deliberately indifferent because she allegedly failed to acknowledge that Morris was incontinent, unable to walk, wheezing, dehydrated and vomiting when she saw him at 1:00 p.m., and because she sent him back to his cell without further monitoring or intervention after he visited the nurses' station.  Warden states that Morris was not having difficulty with his breathing while at the nurses' station.  The record evidence shows that prior to, and after, the time Morris spent at the nurses' station, Morris was "out of it," soaking wet, shaking, unable to stand or walk, and having ongoing  difficulty breathing.  DSO Williams wondered why Morris was not in the hospital, and based upon Morris's condition, Iagmin was shocked when Morris came back to Tank 1 after only a short time.  These facts are noticeably out of sync with Warden's version –  that during the brief period Morris spent at the nurses' station he was coherent, dry, and had normal respiration. Furthermore, the record shows that Morris had pneumonia, a respiratory illness with symptoms that could be consistent with those described by Iagmin.

30

When these facts are viewed in the light most favorable to Plaintiffs, the court must conclude that there is a genuine issue of material fact whether Warden deliberately ignored Morris's respiratory problems, incoherence, and other symptoms that would indicate further medical follow up was needed for him.   Presented with two conflicting accounts, the court is not permitted to weigh the evidence or the relative credibility of the witnesses.   *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Anderson,* 477 U.S. at 254-55.   It is possible that a jury could believe Warden's account of the facts, and find that she did not act with deliberate indifference to Morris's medical needs.   Conversely, if a jury were to believe Iagmin and the other witnesses who were present during the same time frame and observed Morris's allegedly deteriorating physical and mental state, including incoherence, incontinence, shaking, respiratory struggles, and inability to stand or walk, it could find that Warden did purposefully ignore those symptoms and is not entitled to immunity for these claims.   *See Vaughn v. Gray,* 557 F.3d 904, 909 (8th Cir. 2009) (where reasonable jury could find that officials were aware of symptoms but ignored them, officials' "self-serving contention" that they were unaware of need for medical follow up did not provide automatic bar to liability). Warden's motion for summary judgment is granted in part, and denied in part.

### 3.   Conduct of Teresa Frye, L.V.N.

L.V.N. Teresa Frye was the nurse in charge of Tank 1 on August 2, 2009.   She started work at around 6:00 a.m. that day, and was told that she had a "new detoxer"

in the tank.  She did not actually meet Morris until he came to the nurses' station at around 1:00 p.m. The night nurse who gave Frye her report when she arrived for duty did not mention that Morris had broken ribs, chest pain, or breathing problems. Plaintiffs' allegations against Frye are the same as those against P.A. Joseph and Nurse Warden.  The court will evaluate each of those claims with regard to the record evidence of Frye's conduct.

Plaintiffs' first claim against Frye for "ignoring an Expedite" must be dismissed, because they have set forth no evidence at all that suggests Frye had any involvement in any purported delay in bringing Morris to MAP.  The second claim for failing to review prior medical records and vital signs must also be summarily disposed of, for the same reasons it fails against Joseph and Warden.  As with Joseph and Warden, there is also no evidence showing that Frye placed Morris in a cell.  It is undisputed that action was taken prior to Frye's arrival at the jail for her shift, and that Morris was already in Tank 1 at that time.  Because there is no proof of deliberate indifference by Frye as to any of these allegations, the court grants qualified immunity to Frye on each of these claims.

The remaining four claims against Frye are the same as those against Joseph and Warden – 1) no medical care, follow up or assessment from 3:30 a.m. to 1:00 p.m., 2) failing to take action regarding his abnormal early morning vital signs, 3) failure to acknowledge Morris's incontinence, immobility, dehydration, vomiting and respiratory

issues when she saw him at 1:00 p.m., and 4) sending him back to his cell with no further monitoring or intervention despite these symptoms.  As with Warden, it is undisputed that Frye did not arrive to work until 6:00 a.m. on August 2, and thus she cannot be held responsible for any lack of medical attention prior to that time.  Also, for the same reasons the court has previously expressed regarding these same claims against Warden, the court finds that there are also issues of material fact surrounding Frye's conduct (and whether that conduct was deliberately indifferent to Morris's medical needs), and that a reasonable fact finder could find in Plaintiffs' favor on these claims. The court denies qualified immunity to Frye on these claims.  Frye's motion for summary judgment is granted in part, and denied in part.

## IV.    Dallas County's Motion for Summary Judgment

In addition to their claims against the individual Defendants, Plaintiffs also bring suit against Dallas County for municipal liability under section 1983.  Specifically, they contend that the following alleged policies, practices or customs of Dallas County constituted indifference to Morris's serious medical needs: 1) failing to properly implement an "expedite" of an inmate for medical reasons; 2) failing to monitor inmates; 3) failing to monitor and observe inmates' physical and/or medical needs; and/or 4) failing to respond to obvious physical or medical needs.  They also claim that the County's failure to train and supervise its correctional officers caused a deprivation of Morris's constitutional rights.

33

### A.      Applicable Law – Municipal Liability and Failure to Train

A municipality may be held liable for federal civil rights violations under 42 U.S.C. § 1983 if its policies or customs cause a constitutional tort.  *Monell v. Dept. of Social Services,* 436 U.S. 658, 694 (1978); To survive summary judgment, Plaintiffs must present evidence that there was a policymaker, that a policy or custom existed, and that such custom or policy was the cause in fact or moving force behind a constitutional violation. *Id.; Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir.), *cert. denied,* 534 U.S. 820 (2001).   These three elements are needed to distinguish the actions of individual governmental employees from the actions of the governmental unit itself. *Piotrowski,* 237 F.3d at 578; *Kemppainen v. Aransas County Detention Center,* 626 F. Supp.2d 672, 677 (S.D. Tex. 2009), *aff'd,* 460 Fed Appx. 411 (5th Cir. 2012), *cert. denied,* 132 S. Ct. 2394 (2012).

For section 1983 purposes, an official policy may be either a written policy or a persistent widespread practice of municipal officials and employees which, although not an authorized or officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.  *Lawson v. Dallas County,* 286 F.3d 257, 263 (5th Cir. 2002); *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984).   There must be a link between the policy and the constitutional violation, and the policy must be maintained with an objective deliberate indifference to a constitutionally protected right.  *Id.*  An isolated incident is insufficient to show a

custom. *Bennett v. City of Slidell,* 728 F.2d 762, 768 n.3 (5th Cir. 1984), *cert. denied,* 472 U.S. 1016 (1985). Rather, a custom consists of actions that occur for so long and with such regularity "that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow v. City of Wichita Falls, Tex.,* 614 F.3d 161, 169 (5th Cir. 2010), *cert. denied,* 131 S. Ct. 3059 (2011).

Where the plaintiff does not allege the municipality directly inflicted the injury, but rather that a policy or custom has caused an employee to do so, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." *Bd. of County Commissioners v. Brown,* 520 U.S. 397, 405 (1997); *see also Peterson v. City of Fort Worth, Tex.,* 588 F.3d 838, 847 (5th Cir. 2009), *cert. denied,* 498 U.S. 1069 (1991) ("[a] municipality is almost never liable for an isolated unconstitutional act on the part of an employee"). Only when the execution of a county's policies or its customs deprives an individual of constitutional or federal rights, does liability under section 1983 result. *Monell,* 436 U.S. at 694; *Colle v Brazos County, Texas,* 981 F.2d 237, 244 (5th Cir. 1993).

The sheriff is without question the county's final policymaker in the area of law enforcement. *Colle,* 981 F.2d at 244, *citing Turner v. Upton County,* 915 F.2d 133, 136 (5th Cir. 1990). Because the sheriff sets the goals for the county and determines how they will be achieved, a governmental unit such as Dallas County can be held accountable for the illegal or unconstitutional actions of its sheriff. *Id.* A municipal

35

policy must be a deliberate and conscious choice by a municipality's policymaker. *Colle,* 981 F.2d at 245. While the municipal policymaker's failure to adopt a precaution can be the basis for liability under section 1983, such omission must amount to an intentional choice, not merely an unintentional negligent oversight. *Id.* A municipal failure to adopt a policy must be done with deliberate indifference, when it is obvious that the likely consequences of not adopting a policy will be a deprivation of rights. *Id., citing City of Canton, Ohio v. Harris,* 489 U.S. 378, 390 (1989).

Failure to train may be a policy for purposes of 42 U.S.C. § 1983 only if such failure "reflects a 'deliberate' or 'conscious' choice by a municipality." *City of Canton,* 489 U.S. at 389. Municipalities are not normally liable for inadequate training, but failure to properly train may be a "policy" if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. If city policymakers know that their officers will be required to do a particular task, the need to train officers in that task can be characterized as "so obvious" that failure to give such training could be considered deliberate indifference to constitutional rights. *City of Canton,* 489 U.S. at 390 n.10, *citing Tennessee v. Garner,* 471 U.S. 1 (1985).

To prevail on a failure to train claim, the plaintiff must demonstrate 1) that the county's training procedures were inadequate; 2) that the municipality was deliberately indifferent in adopting its training policy; and 3) that the inadequate training policy directly caused the constitutional deprivations in question. *Zarnow,* 614 F.3d at 170; *World Wide Street Preachers Fellowship v. Town of Columbia,* 591 F.3d 747, 756 (5th Cir. 2009). It must be specifically alleged how a particular training program is defective. *Roberts v. City of Shreveport,* 397 F.3d 287, 293 (5th Cir. 2005). A plaintiff must show more than that the incident could have been avoided with more or better training. *Id.* In identifying the inadequacy, "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform," and the identified deficiency in a city's training program must be closely related to the ultimate injury. *City of Canton,* 489 U.S. at 390-91; *Goodman v. Harris County,* 571 F.3d 388, 395 (5th Cir. 2009), *cert. denied,* 558 U.S. 1148 (2010).  One officer's unsatisfactory training will not establish municipal liability, because that individual's shortcomings or mistakes may have been caused by factors other than a deficient training program. *City of Canton,* 489 U.S. at 390-91. Evidence that a municipality's training program complied with state law is also a factor that weighs against a finding of failure to train. *Zarnow,* 614 F.3d at 171, *citing Conner v. Travis Cnty.,* 209 F.3d 794, 798 (5th Cir. 2000).

"Failure to train" claims are most commonly premised on a pattern of incidents in which citizens were injured and which show that failure to train was an official policy

37

of the municipality.  *Snyder v. Trepagnier,* 142 F.3d 791, 798 (5th Cir. 1998), *cert. dism'd,* 526 U.S. 1083 (1999); *Valle v. City of Houston,* 613 F.3d 536, 547 (5th Cir. 2010), *cert. denied,* 131 S. Ct. 1094 (2011).  Although not impossible, it is very difficult to make a showing of deliberate indifference based upon a single incident.  *Sanders-Burns v. City of Plano,* 594 F.3d 366, 381 (5th Cir. 2010).  This exception is narrow, and the plaintiff "must prove that the highly predictable consequence of the failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the violation."  *Id., quoting Davis v. City of N. Richland Hills,* 406 F.3d 375, 383 n.4 (5th Cir. 2005).

### B.    Plaintiffs' Section 1983 Claims Against Dallas County

As the court has stated above, Plaintiffs assert that various customs or practices employed by the County constitute official policies that caused them constitutional injury.  Thus, Plaintiffs bring these claims against the County, hoping to establish municipal liability under 42 U.S.C. § 1983.  The court will review and analyze each of these claims.

### 1.    Failure to Properly Implement an "Expedite"

This claim is based on Plaintiffs' allegation that the County was too slow to bring Morris to MAP after he had been seen in Central Intake and designated as an "Expedite" for medical reasons.  There is no evidence in the record regarding the existence of a written policy of the County regarding "Expedite" status, what it means, or a mandatory

time line for the implementation of an "Expedite" request.  Therefore, to move beyond the summary judgment stage, Plaintiffs must present evidence raising a genuine issue of material fact whether it was a regular custom or practice for the County to ignore or fail to process expedited detainees in a timely fashion.  To do so, they must show that these "Expedite" requests were regularly ignored, delayed or otherwise not properly implemented.  *See Zarnow,* 614 F.3d at 169 (actions must happen with such regularity that course of conduct demonstrates governing body's knowledge and acceptance of the disputed conduct).  They must also present evidence that the custom was a "moving force" behind the alleged constitutional violation, and that the custom was continued or maintained with deliberate indifference to a constitutionally protected right.  *Monell,* 436 U.S. at 694; *Piotrowski,* 237 F.3d at 578; *Lawson,* 286 F.3d at 263.

Here, Plaintiffs have set forth no evidence regarding any custom or regular practice concerning "expedite" status at the Dallas County Jail.  As to this claim, their evidence and their complaint is limited to what happened in this particular situation – that Morris was not taken to MAP as quickly as they feel he should have been.  There are no allegations or proof that pretrial detainees were routinely delayed in being brought to MAP.  At most, Plaintiffs have raised a material issue of fact regarding an isolated incident or mistake by an employee or employees of the jail, which is, as a matter of law, insufficient to establish a policy or custom.  *Bennett,* 728 F.3d at 768 n.3.  The court will enter summary judgment for the County on this claim.

39

## 2.    Lack of Monitoring and Observation

Plaintiffs' next two claims against the County are for failing to monitor inmates, and failing to monitor/observe inmates' physical and/or medical needs.  As with the previous claim, Plaintiffs must produce evidence of a policymaker, a policy or custom, and that the policy or custom was a moving force behind the asserted constitutional deprivation.  *Monell,* 436 U.S. at 694; *Piotrowski,* 237 F.3d at 578.

Plaintiffs' summary judgment evidence shows that Sheriff Valdez was the jail's policymaker.  Viewing the summary judgment record in the light most favorable to them, there is also ample evidence in the record to support Plaintiffs' position that the County's policy or custom was not to monitor inmates or observe them for their physical and/or medical needs.  The tanks were checked by guards for fire hazards, and the guards would come around to provide meals and cleaning supplies to the inmates.  Otherwise the guards only went into the tanks to check for hygiene and cleanliness.   The County stipulated that the DSOs do not monitor the medical condition of the inmates, and that there are no policies for such monitoring.  The inmates are unable to directly contact medical staff, and the medical staff does not go into the tanks to monitor or observe the inmates themselves.  Not all tanks are within view of the medical staff, including Tank 1 where Morris was housed.  The jail did not have a procedure by which guards would pass  on health  information to  the nursing  staff.   The County's  own  witnesses, by

testimony or stipulation, acknowledge that all of the above was a routine course of conduct at the jail, and that the County acknowledged and accepted such conduct.

Finally, the court must determine whether there is a material fact issue regarding deliberate indifference, and whether the custom was a moving force. *Id.* The County's stipulation that it had no policy by which DSOs monitored inmate health, coupled with Valdez's emphatic testimony that she does not and will not permit DSOs to watch for medical symptoms in inmates certainly suggests deliberateness. The record shows that the structure of the jail and the duties assigned to the non-medical personnel, namely the DSOs, creates a disconnect between the inmates and the medical care they may need. The inmates in the infirmary have no way to access medical care directly. They must do so through the DSOs, who explicitly are not tasked with anything related to medical care, even though they are assigned to work in the infirmary, where inmates who need medical care are kept. Sheriff Valdez knows that the jail health care delivery system is structured in such a way that inmates can only obtain medical attention through the guards, yet the guards do not obtain and evaluate information regarding inmates' conditions or medical needs, or transmit that information to the nursing staff.

In the court's view, it is possible that a jury could find that the County's deliberate and conscious decisions regarding the training, and lack of training, provided to its DSOs, the way the infirmary was structured (including lack of direct access between inmates and the nursing staff), and the absence of procedures for

41

communication between the nurses and DSOs concerning emergent medical symptoms were a custom that was adopted or continued although it was obvious that its likely consequence would be a deprivation of medical care, and thus, a deprivation of constitutional rights. *Colle,* 981 F.2d at 245; *City of Canton,* 489 U.S. at 390. Given these facts, and viewing the record in the light most favorable to Plaintiffs, the court must find that there exists a genuine issue of material fact regarding deliberate indifference and moving force. Therefore, the County's motion for summary judgment on these claims is denied.

### 3. Failing to Respond to Obvious Physical and Medical Needs

Plaintiffs next allege that Dallas County deprived Morris of his constitutional rights by failing to respond to his obvious physical and medical needs. As with their other claims against the County, Plaintiffs must set forth competent summary judgment evidence of a policymaker, a custom or policy and that the custom or policy was the cause in fact or moving force behind the asserted constitutional violation. *Monell,* 436 U.S. at 694; *Piotrowski,* 237 F.3d at 578. They must also show that the policy or custom was adopted or maintained with objective deliberate indifference to a constitutionally protected right. *Lawson,* 286 F.3d at 263; *Webster,* 735 F.2d at 841.

Plaintiffs have set forth evidence that Iagmin and other inmates made multiple calls to the guard station trying to get medical help for Morris, but that those calls were either ignored, or not responded to in a timely manner. Their evidence also suggests

42

that the DSOs who encountered Morris had some awareness that he was ill, but that they did not seek medical attention for him as early as they should have. Nevertheless, even when the record as a whole is viewed in the light most favorable to them, Plaintiffs' evidence is limited to what happened in Morris's situation. They have not shown that this lack of response was an ongoing, routine and regular occurrence at the jail, so that it rises to a course of conduct demonstrating the county's knowledge and acceptance of such conduct. *Zarnow,* 614 F.3d at 169; *see also Bennett,* 728 F.2d at 768 n.3 (isolated incidents do not establish a custom). Therefore, because Plaintiffs have not raised a material issue of fact regarding a policy or custom, this claim must be dismissed.

### 4.    Failure to Train

Finally, Plaintiffs bring a claim against the County for failure to train, alleging that it violated Morris's constitutional right to medical care because it did not train its correctional officers on how to observe and assess inmates' medical needs and respond to those needs. It is undisputed that Sheriff Valdez is a policymaker, and that she made a deliberate choice not to give the jail's DSOs training on medical observation, assessment and response. This failure to train can be considered a policy if the duties assigned to the specific officers make the need for training obvious, and the consequence of a constitutional violation so likely that the policymaker can be said to have been deliberately indifferent to the need. *City of Canton,* 489 U.S. at 390.

43

As is described more fully above, the record shows that other than a CPR course, the County does not train officers to look for or be aware of symptoms of physical illness, how to recognize and respond to medical needs, how to document requests from inmates for medical care, or how to pass on medical concerns to jail nursing staff. Valdez confirmed that these are the County's policies and that as the policymaker, she is "against" any such training. Therefore, Plaintiffs have provided sufficient evidence showing that the County's failure to train was a known and regular occurrence that could be considered a custom. *Zarnow,* 614 F.3d at 169.

Because Plaintiffs have not presented evidence of other similar  incidents that would demonstrate a pattern of constitutional injuries indicating a need to train, they must rely on the "single incident" exception, which requires a showing that a "highly predictable consequence of the failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the violation." *Sanders-Burns,* 594 F.3d at 381, *quoting Davis,* 406 F.3d at 383 n.4.  The lack of training must be viewed in relation to the tasks the DSOs must perform, and how closely the lack of training is related to the ultimate injury.  *Goodman,* 571 F.3d at 395.

As with Plaintiffs' claims for lack of monitoring, the court finds that Plaintiffs have successfully raised a fact issue on their failure to train claim.  As the court discusses more fully above with regard to Plaintiffs' claim for lack of monitoring, the jail's personnel and procedures are structured so that there is no direct link between the

inmates and the health care providers.  Inmates cannot request health care attention directly from the medical personnel.  Therefore, the inmates are put in a position where they must rely upon the DSOs provide the link between them and any needed medical attention.

In spite of this setup,  the DSOs are not given any training as to how to monitor for, observe, and determine potential medical needs in the inmates, how to respond to those needs, or how to forward those needs on to the health care staff.  There is no routine process in place to ensure that the officers effectively provide the needed conduit between the inmates and the nurses.  Therefore, because the DSOs are the only persons in somewhat regular and direct contact with the inmates, Plaintiffs have raised a fact question whether giving them no training in these areas is inadequate "in relation to the tasks [they] must perform," whether Morris's injury was a predictable consequence of the absence of training, and that the failure to train was the moving force behind the alleged constitutional violation.  *City of Canton,* 498 U.S. at 390-91; *Goodman,* 571 F.3d at 395; *Sanders-Burns,* 594 F.3d at381.  Through  Valdez's testimony, they have also raised  a  material fact issue regarding deliberate indifference.  The court must deny the County's request for summary judgment on this claim.

## C.    Other Claims Against Dallas County

As the court mentions above, Plaintiffs also pleaded claims against the County for disability discrimination pursuant to the ADA, 42 U.S.C. § 12101, *et seq.,* as well as state

45

law claims for negligence and gross negligence.  The County has moved for summary judgment on all of these claims, but Plaintiffs have made no response, and have set forth no evidence or legal argument concerning any of these causes of action.  Accordingly, the court determines that they have abandoned these claims.  *Black v. N. Panola Sch. Dist.,* 461 F.3d 584, 588 n.1 (5th Cir. 2006), *citing Vela v. City of Houston,* 276 F.3d 659, 679 (5th Cir. 2001); *Yohey v. Collins,* 985 F.2d 222, 224-25 (5th Cir. 1993). Plaintiffs' claims for disability discrimination, negligence, and gross negligence must be dismissed.

### V.    Conclusion

For the foregoing reasons, Defendant Wendy Joseph's motion for summary judgment is **granted,** and Plaintiffs' claims against Joseph are hereby **dismissed with prejudice.**

Defendants' Teresa Frye and Andrea Warden's motions for summary judgment are **granted in part,** and **denied in part.**  Plaintiffs' claims against Frye and Warden for failure to implement an "Expedite," placing Morris in a cell, failing to provide medical attention to him prior to the start of their shifts, and failing to review earlier vital sign readings are all **dismissed with prejudice.**  Plaintiffs have set forth genuine issues of material fact regarding their remaining claims against Frye and Warden for failing to respond to Morris's abnormal vital signs after they were conveyed by Haynes, failing to acknowledge Morris's symptoms when they saw him at the nurses' station, and sending Morris back to his cell after they saw him at the nurses' station, instead of

46

seeking further medical attention for him.   With regard to these claims, Frye and Warden's motions for summary judgment are **denied.**

Defendant Dallas County's motion for summary judgment is also **granted in part,** and **denied in part.**   Plaintiffs' claims against Dallas County for failing to implement an "Expedite" and failure to respond to obvious physical and medical needs are **dismissed with prejudice.**   Dallas County's motion for summary judgment regarding Plaintiffs' claims for failure to monitor and failure to train is **denied.**

**SO ORDERED.**

Signed June 18th, 2013.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE